# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

United States of America,

             v.

Anthony Rice,

             Defendant.

Case No. 03-cr-441-8 (RBW)

# EMERGENCY MOTION FOR COMPASSIONATE RELEASE

TABLE OF CONTENTS

I. INTRODUCTION.................................................................................................. 4

II. BACKGROUND.................................................................................................. 9

    A. Mr. Rice was a low-level, non-violent drug dealer in a larger drug conspiracy ............ 9

    B. Mr. Rice received a life sentence *not* based on his role in the conspiracy or the
       severity of the crime; rather, it was the result of the mandatory life sentence
       imposed by § 841(b)(1)(A)................................................................................ 12

    C. Mr. Rice's trial attorney wrongly advised him he faced 14 to 17.5 years if convicted,
       not mandatory life................................................................................................ 14

    D. Mr. Rice's post-conviction attorney botched filing his ineffective assistance of
       counsel claim in a timely fashion, thereby foreclosing his ability to remedy his trial
       attorney's flawed advice.................................................................................. 16

III. LEGAL PRINCIPLES....................................................................................... 19

IV. ARGUMENT.................................................................................................... 20

    A. Mr. Rice's compassionate release request is properly before this Court ................... 20

    B. Extraordinary and compelling reasons justify his compassionate release ................. 20

        i. Courts agree that Mr. Rice's harsh sentence, which is vastly out of line with
            similarly situated defendants and would no longer be statutorily required
            today, provides extraordinary and compelling reasons to reduce his sentence ... 22

        ii. The government's decision to seek mandatory life, in contravention of
            Congress's intent, provides extraordinary and compelling reasons to
            reduce his sentence........................................................................................ 29

        iii. The high likelihood that Mr. Rice would have successfully raised an ineffective
            assistance of counsel claim, had it not been procedurally precluded, provides
            extraordinary and compelling reasons to reduce his sentence ....................... 34

        iv. Courts agree that Mr. Rice's age, medical vulnerabilities, and Covid-19
            provide extraordinary and compelling reasons to reduce his sentence ............ 39

    C. Every § 3553(a) factor strongly supports Mr. Rice's compassionate release ............... 45

        i. The applicable guideline, the seriousness of the offense, and the need for
            the sentence to provide just punishment support his compassionate release ..... 46

ii.    The need to avoid unwarranted sentence disparities supports his
       compassionate release………………………………………………….. 47

iii.   The need to protect the community and Mr. Rice's significant post-sentence
       rehabilitation support his compassionate release……………………………… 49

iv.    Mr. Rice's history and characteristics support his compassionate release…….. 50

v.     Principles of deterrence support his compassionate release…………………… 51

vi.    The need to provide Mr. Rice with needed medical care in the most effective
       manner supports his compassionate release…………………………………… 52

**V. CONCLUSION**………………………………………………………………………54

## I.   INTRODUCTION

Mr. Rice, through counsel, respectfully requests that this Court reduce his life sentence to time served, which is equivalent to 16.5 years in prison, under 18 U.S.C. § 3582(c)(1)(A). Mr. Rice is worthy of compassionate release based on at least five extraordinary and compelling reasons:

**1.** *Excessively harsh sentence today*: Mr. Rice is a 72-year-old grandfather who has served over 16 years of a life sentence in prison for being a low-level, non-violent drug dealer in Washington, D.C.  Life without parole for this offense is an unduly harsh sentence.  The average sentence for drug trafficking in the D.C. Circuit is 4 years.  *See* U.S. Sentencing Comm'n, *Statistical Information Packet, Fiscal Year 2019*, *D.C. Circuit* 11 (Apr. 2020).[1]  "Under federal law, 'an aircraft hijacker, a terrorist who detonates a bomb in a public place, a racist who attacks a minority with the intent to kill and inflicts permanent or life threatening injuries, a second-degree murderer, and a rapist would all be subject to less harsh sentences than" Mr. Rice.  *United States v. Rivera-Ruperto*, 884 F.3d 25, 32 (1st Cir. 2018) (citation and ellipses omitted).

The bulk of this harsh sentence was not based on his role in the offense or the severity of the crime— "[t]he seventeen other indicted defendants[,]" many of whom were more culpable, "either had their charges dismissed or entered guilty pleas with sentences ranging from time served to a maximum of 10 years in prison."  *United States v. Rice*, 727 Fed. Appx. 697, 699 (D.C. Cir. Apr. 3, 2018).  Rather, it was the result of the mandatory life sentence imposed by 21 U.S.C. § 841(b)(1)(A), which has since been amended such that ***it would no longer require mandatory***

---

[1] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/dcc19.pdf.

*life*. Mr. Rice's original sentence is thus substantially "out-of-step with sentences that would be imposed on similarly-situated defendants today." *United States v. Curtis*, No. 03-cr-533-BAH, 2020 WL 1935543, at *5 (D.D.C. Apr. 22, 2020) (granting compassionate release to a defendant who had served 17 years of life sentence for sex trafficking children based, in part, on the disparity between the sentence defendant received and what he would receive today); *see also United States v. Smith*, No. 14-cr-189-TSC, ECF No. 76 (D.D.C. May 14, 2020) (granting compassionate release "to make his sentence consistent with the D.C. Circuit's recent holding [in *Winstead*, 890 F.3d at 1091] that the applicable provision of the career offender guideline 'clearly excludes inchoate offenses'"). Today, the guidelines would recommend 135 to 168 months (that is, 11 years and 2 months to 14 years); Mr. Rice has served approximately 198 months (16.5 years)—a sentence at least 2.5 years more than what the guidelines deem warranted today.

   **2.** *Excessively harsh sentence at the time:* Mr. Rice was not the type of defendant Congress sought to subject to mandatory life. Section 841(b)(1)(A) previously exposed a defendant to mandatory life if he had two prior felony drug convictions. This type of "three strikes" law was designed to target habitual recidivists. Mr. Rice was subject to mandatory life based on two prior drug convictions, but those two convictions involved two drug sales only three days apart to the same undercover officer, without any intervening arrest. The two drug sales occurred in 1974, 29 years before his arrest for the instant offense. And, the sentences for both convictions were imposed on the same day, by the same judge, and ordered to run concurrent to each other. The only reason they counted as two convictions was that the government elected to charge each drug sale separately. At sentencing in this case, the government acknowledged that

his 1974 offenses would likely have been charged as a *single offense* under the standards in place at the time, meaning that he would have had only one "strike" on his record.  *See* Nov. 7, 2006 Sent'g Tr. at 5 (hereinafter, "Sent'g Tr.").

      **3. *Ineffective assistance***: Mr. Rice experienced deficient representation at each critical stage of his defense.  First, Mr. Rice's trial attorney assured him that he did *not* face mandatory life and instead faced only 14 to 17.5 years.  His attorney told this very Court that the sentencing enhancements did not apply to Mr. Rice because he believed they were "untimely."  ECF No. 941-5 at 4.  He was wrong on both fronts: 1) Mr. Rice actually faced mandatory life; and 2) any timeliness objections were nonsensical because there were no relevant timeliness requirements. "Representation is deficient when counsel . . . offers a 'plainly incorrect' estimate of the likely sentence due to ignorance of the applicable law of which he 'should have been aware.'" *United States v. Aguiar*, 894 F.3d 351, 357 (D.C. Cir. 2018) (quoting *United States v. Booze*, 293 F.3d 516 (D.C. Cir. 2002).  Here, all indicators point in one direction: Mr. Rice's attorney offered plainly incorrect estimates of his sentencing exposure based on a fundamental misunderstanding of the applicable sentencing enhancements.  Mr. Rice's post-conviction attorney raised this issue in a § 2255 motion, but she accidentally filed it 18 days late, thereby procedurally precluding him from addressing the merits.  *See* Wick's Affidavit, ECF No. 969 at 6; ECF No. 941; *United States v. Rice*, 227 F. Supp. 3d 82, 84 (D.D.C. 2017).  Thus, Mr. Rice experienced legal representation so ineffective that it precluded his ability to challenge its ineffectiveness.

      **4. *Exceptional post-sentence rehabilitation:*** For the past 16.5 years, Mr. Rice has lived each day with the knowledge that he would die in a cell—away from his wife, children, grandchildren, and siblings.  And yet, for those 16.5 years, with no realistic hope of sharing a meal

with his family or holding his grandchildren, Mr. Rice still conducted himself in an exemplary manner.  He has had only one minor infraction from 2009 (giving/receiving money without authorization), and has otherwise been "incident free."  *See* Ex. 8, Progress Reports at 3-4.

Rather than engage in misconduct while incarcerated, Mr. Rice has taken the role of mentor to the younger inmates in his unit.  *See* Ex. 1, Anthony Rice Letter; Ex. 4, Rhozier Brown Letter.  He has earned his GED, taken additional educational courses, and engaged in weekly faith-based programs.  *See* Ex. 8, Progress Reports at 3, 26-27.  And even from prison, Mr. Rice has been a guiding light to his children, teaching them the errors of his ways, the importance of good morals, and the need to pursue higher education.  *See* Ex. 5, SeBryna Coffey Letter; Ex. 6, Tamika Coffey Letter.  The BOP has categorized him as having the lowest possible recidivism risk: "minimum."  Ex. 8, Progress Reports at 2.  Indeed, at 72 years old, he falls into the age group that has the lowest recidivism rate—0 percent.  *See* OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* iii, 40 (Feb. 2016).[2]  His age and exemplary behavior over the last 16.5 years, when there were no potential external rewards, realistically forecloses the probability of recidivism.

**5. *High risk of severe illness or death from Covid-19***:  Mr. Rice is a 72-year-old, African American male who suffers from diabetes, hypertension, chronic kidney disease, hyperlipidemia, latent tuberculosis, and diabetic retinopathy.  Ex. 10, Medical Records at 1-2.  Given his age, race, and medical vulnerabilities, he is already "living on borrowed time."  Ex. 1, Anthony Rice Letter at 8; National Vital Statistics Reports, CDC, *United States Life Tables, 2017*, at 46 (June 24, 2019)

---

[2] Available at https://oig.justice.gov/reports/2015/e1505.pdf.

(showing that the life expectancy for a Black male in the United States is 71.9 years)[3]; *see also* OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, 1-2 (Feb. 2016) ("[A]n inmate's physiological age averages 10–15 years older than his or her chronological age due to the combination of stresses associated with incarceration and the conditions that he or she may have been exposed to prior to incarceration.").[4]  With the added threat of Covid-19, his risk of dying is palpable.  Covid-19 has killed 87 federal inmates, and as of June 23, 2020, the BOP reported 6,324 inmates and 691 staff have tested positive.[5]  CDC guidance as well as other medical journals establish that his age and comorbidities place him at great risk of contracting, suffering, and dying from Covid-19.  *See infra* Section IV.B.iv.  Mr. Rice should not be in prison during this dangerous time.

*"More and more courts have found that exceptional rehabilitation; large sentencing disparities; and COVID-19's unprecedented dangers all constitute extraordinary and compelling reasons to grant compassionate release."*  *United States v. Brown*, No. 4:05-cr-00227-1, 2020 WL 2091802, at *7 (S.D. Iowa Apr. 29, 2020) (emphasis added) (granting compassionate release to defendant who had served approximately 15 years of a 42.5-year sentence for drug trafficking and firearm offenses); *see also infra* Section IV.B.i (discussing additional cases).  Mr. Rice respectfully requests that this Court grant his compassionate release, just as other courts have done, so that he can return to his supportive and loving family who have written numerous heartfelt letters on his behalf.

---

[3] Available at https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_07-508.pdf.

[4] Available at https://oig.justice.gov/reports/2015/e1505.pdf.

[5] BOP numbers are obtained from https://www.bop.gov/coronavirus/ on a daily basis (last visited June 23, 2020).

## II.   Background

### A.  Mr. Rice was a low-level, non-violent drug dealer in a larger drug conspiracy.

For several months in late 2002 and early 2003, Mr. Rice sold drugs with an acquaintance from his neighborhood in the District of Columbia named Raven Carroll.  *See* PSR at 4-10. Although Mr. Rice bought and sold the drugs locally, the drugs were supplied through a larger drug conspiracy that started in the Dominican Republic and spread to the District of Columbia, Maryland, New York, New Jersey, and Puerto Rico.

The PSR describes the conspiracy's organization and hierarchy: two foreign nationals operating out of the Dominican Republic led the drug trafficking operation; they smuggled heroin and cocaine into the United States via their agent Narciso Liriano-Alamarante ("Liriano") and others; Liriano in turn supplied drugs to Raven Carroll and others; and Carroll in turn supplied drugs to several dealers in Washington, D.C., including Anthony Rice, Walter Webb, Torrance Owens, Roland Bailey, Brian Keith Abraham, and others.  *Id.* at 5-6; *See also* Factual Proffer, ECF No. 320 at ¶¶ 174-75.  Liriano would then collect the money for the drugs and transfer the money to Miriam Marte, who would launder the proceeds and transfer the money to those in the Dominican Republic.  *Id.*  The following graph provides a visual illustration of the conspiracy:



Mr. Rice was thus at the bottom of the conspiracy described by the government.  *See* PSR at 5.  The government's evidence showed he was acquainted with very few of the people in the conspiracy and had no supervisory role in the conduct.  *See* PSR at 5-10.  The government had no evidence or allegations that Mr. Rice possessed weapons or engaged in violence.  *See id.*  Rather, the government's evidence established that Mr. Rice interacted primarily with Raven Carroll and sold drugs in the District of Columbia.  *See id.*  Ultimately, Mr. Rice was responsible for selling approximately one kilogram of each heroin and powder cocaine.  *Id.* at 10.

On November 12, 2003, Mr. Rice was arrested.  A grand jury indicted Mr. Rice, along with 18 others, for participating in a drug trafficking conspiracy.  *See* Indictment, ECF No. 1.  Of the ten counts set forth in the indictment, only two applied to Mr. Rice:  Count 1 charged him, along with 18 codefendants, with conspiracy to import one kilogram or more of heroin and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 963 (criminalizes conspiracy), 960(a)(1) (criminalizes importing a controlled substance), and 960(b)(1)(A) (provides penalties based on substance type and quantity); and Count 2 charged him, along with 18 codefendants, with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, and fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 (criminalizes conspiracy), 841(a)(1) (criminalizes distribution of a controlled substance), and 841(b)(1)(A)(iii) (provides penalties based on substance type and quantity).  *See id.*  Counts 3 through 10 involved individual drug sales by other participants in the conspiracy. *See id.*

On January 9, 2006, Mr. Rice proceeded to trial.  On February 15, 2006, the jury convicted him of both conspiracy counts.

On November 7, 2006, this Court sentenced Mr. Rice to a total sentence of life imprisonment plus 20 years—Count 1 required a mandatory 20 years and Count 2 required mandatory life imprisonment.  *See* Judgement, ECF No. 557.

With one exception, Mr. Rice's other codefendants received sentences much lower—they "either had their charges dismissed or entered guilty pleas with sentences ranging from time served to a maximum of 10 years in prison."  *United States v. Rice*, 727 Fed. Appx. 697, 699 (D.C.

Cir. Apr. 3, 2018); *see also* Ex. 7, Sentencing Chart (documenting each co-conspirator's relevant conduct, charges, conviction, and sentence).[6]

### B. Mr. Rice received a life sentence *not* based on his role in the conspiracy or the severity of the crime; rather, it was the result of the mandatory life sentence imposed by § 841(b)(1)(A).

Mr. Rice was subject to a statutory mandatory life sentence under 28 U.S.C. § 841(b)(1)(A) because the government decided to file a § 851 enhancement based on Mr. Rice's two prior drug convictions from 1974. *See* ECF No. 277;[7] PSR at 18-19; Sent'g Tr. at 5.

These two prior convictions involved two drug sales, three days apart, to the same undercover officer, and occurred 29 years before his arrest for the instant offense. First, Mr. Rice and a friend sold heroin to an undercover officer. Sent'g Tr. at 24. Three days later, Mr. Rice made a second sale to the same undercover officer. *Id.* On February 22, 1974, Mr. Rice was indicted in two separate criminal cases that were both assigned to Judge John Lewis Smith in this Court—Criminal Case No. 74-83 and 74-84. Gov't Sent'g Mot., ECF No. 499 at 2. Mr. Rice proceeded to trial on the first case and was convicted; he then pled guilty in the second case. *Id.* The Court sentenced him to 20 months to five years for both convictions on the same day, May 20, 1974, and ordered the sentences to run concurrent to each other. *Id.* at 2-3; PSR at 12-13; Sent'g Tr. at 24.

---

[6] The one exception is Roland James Bailey who ultimately received 30 years. ECF No. 989. For reasons discussed below, Mr. Bailey and Rice are not similarly situated parties. *See infra* note 55.

[7] In the government's § 851 notice, it also alleged that Mr. Rice qualified as a career offender under § 4B.1(a) Sentencing Guidelines; however, the government later retracted that argument after it realized Mr. Rice's prior convictions were too old for him to qualify as a career offender. Gov't Sent'g Mot., ECF No. 499 at 11.

At the time of sentencing in this case, a conviction under § 841(b)(1)(A) mandated a life sentence without parole if the defendant had previously been convicted of *two* "felony drug offenses."[8]  *See* 21 U.S.C. § 841(b)(1)(A) ("If any person commits a violation of this [statute] . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . .").  Mr. Rice was convicted of this offense in Count 2.

Similarly, a conviction under 21 U.S.C. § 960(b)(1) mandated a minimum of 20 years if the defendant had previously been convicted of a felony drug offense.  *Id.* ("If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not less than 20 years . . . .").  Mr. Rice was convicted of this offense in Count 1.

These sentencing enhancements were not automatically imposed on every drug dealing defendant with a prior felony drug conviction.  Rather, for the enhancements to be triggered, the government was required to file notice under 21 U.S.C. § 851 of the defendant's prior felony drug convictions that it intended to rely upon "prior to trial or before entry of a plea of guilty." 21 U.S.C. § 851(a)(1).  In this case, the government did so on May 4, 2005, seven months before trial.  *See* ECF No. 277.

---

[8] A "felony drug offense" was defined as "an offense that is punishable by imprisonment for more than one year . . . that prohibits or restricts conduct ***relating to*** narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."  21 U.S.C. § 802(44).  This term was interpreted to mean any drug offense qualified, sentence length on the conviction did not matter, and the age of the conviction did not matter—i.e., there was no expiration for prior drug offenses. *See* 21 U.S.C. § 802(44).

13

Because of this, when the jury convicted Mr. Rice of the charges, this Court had no option but to impose a mandatory 20-year sentence on Count 1 and a mandatory life sentence on Count 2. Sent'g Tr. at 32 (Court: "I don't see where I have any other alternative other than to impose the mandatory sentence, as called for, because of your prior history."); *id.* at 33 (Court: "It is always unfortunate that somebody has to go to prison, especially for the rest of their life, as the law requires, but that's the law."). Accordingly, on November 7, 2006, Mr. Rice was sentenced to life plus 20 years. *See* Judgment, ECF No. 557.

### C. Mr. Rice's trial attorney wrongly advised him he faced 14 to 17.5 years if convicted, not mandatory life.

Mr. Rice was first represented by Grandison Hill.[9]  Prior to trial, Hill explained to Mr. Rice that his two prior drug convictions from 1974 were too old to enhance his sentence— this was wrong because § 841(b)(1)(A) contains no such expiration date for counting prior felonies. *See* Rice Affidavit, ECF No. 941-4. Based on that error, Hill informed Mr. Rice that he was facing a guideline range of 14 to 17.5 years (that is, 168 to 210 months) if convicted. *See id.* In reality, however, Mr. Rice was facing a statutorily mandated life sentence.

On May 3, 2005, seven months before trial, the government notified Hill and the Court that it intended to seek enhanced penalties based upon his prior convictions that could potentially expose him to "a mandatory term of life imprisonment." ECF No. 227. Convinced Mr. Rice's convictions were too old, Hill continued to erroneously believe that Mr. Rice did not qualify for the mandatory life sentence. *See* ECF No. 941-4. Indeed, on May 23, 2005, the parties appeared

---

[9] *See, e.g.*, *Tillery v. United States*, 419 A.2d 970, 976 (D.C. 1980) (reversing a first-degree murder conviction based on Hill's "gross incompetence in the preparation, investigation, and presentation").

before the Court for a motions hearing where Hill notified the Court that he received the § 851

notice and noted that "it is our position – I think we addressed this earlier, it is our position that

it was untimely." ECF No. 941-5 at 4. Given that § 851 only requires the notice to be filed

before trial, and that the government provided notice in this case seven months before trial, Hill's

contention that the notice was "untimely" makes no sense. *See* § 851(a)(1) (requiring that the

government provide notice "before trial, or before entry of a plea of guilty").

   The government made several plea offers to Mr. Rice. Mr. Rice recalls the government

offered him 17 years in prison. ECF No. 941-4 at 2. But relying on his attorney's advice that the

maximum of the guideline range amounted to 17.5 years if convicted, he rejected that offer. *Id.*

On the eve of trial, the government offered 15 years in prison, but he similarly rejected that offer.

*Id.*

   Mr. Rice then proceeded to trial and was convicted. Hill waived presenting an opening

statement. ECF No. 941-6 at 3; 941-7 at 2. He did not call any witnesses. ECF No. 941-7 at 4.

His defense consisted of moving into evidence a few investigative documents. *Id.* at 2-3. Both of

Mr. Rice's appellate counsels, Jennifer Wicks and Gary Proctor, would later write that they

believed Hill failed to conduct any pretrial investigation. *See* Appellant's Br., *United States v.*

*Rice*, CA No., 17-3007, at 24 n.8 (D.C. Cir. Nov. 8, 2017).

   After Mr. Rice was convicted, he filed a *pro se* motion for appointment of new counsel.

ECF No. 417. This Court appointed Veta Carney to represent him during the sentencing stage.

ECF No. 478. At the sentencing hearing, Ms. Carney alerted the Court to Hill's failure to inform

Mr. Rice that he was actually facing a mandatory life sentence. ECF No. 501 at 2. This Court

declined to entertain the issue at sentencing, recommending instead that Mr. Rice raise the issue

in a § 2255 motion.  Sent'g Tr. at 20:2–8 (Court: "[I]t seems to me that necessarily then raises a

claim of ineffective assistance of counsel . . . . It seems to me we go to sentencing and then he

files—if he wants to—his 2255 alleging ineffective assistance."); *id*. at 37:18–20 (Court:

"Counsel, if you desire to file something on his behalf in reference to a 2255, obviously, you have

a right to do that.").  The Court then sentenced Mr. Rice to the statutorily mandated life

imprisonment.

### D. Mr. Rice's post-conviction attorney botched filing his ineffective assistance of counsel claim in a timely fashion, thereby foreclosing his ability to remedy his trial attorney's flawed advice.

Mr. Rice's family retained attorney James W. Beane Jr. to represent him in his direct

appeal.  "Because that attorney had multiple complaints against him pending before the D.C. Bar

Association and because he failed to communicate with Rice for more than eight months, Rice

moved [the D.C. Circuit] *pro se* for the appointment of a new attorney."  *United States v. Rice*, 727

Fed. Appx. 697, 700 (D.C. Cir. 2018).

The D.C. Circuit appointed Jenifer Wicks, who represented his co-defendant at trial, to

be his appellate attorney.  *See id.*  In preparation for his appeal, Mr. Rice asked Wicks to raise the

ineffectiveness of his trial counsel claim, but she advised that argument should be addressed in a

§ 2255 motion.  Wicks Affidavit, ECF No. 969 at 6.  Accordingly, in the appeal, Wicks only

argued that his conviction violated the Speedy Trial Act and his Sixth Amendment right to a

speedy trial.  *See* Appellant's Br., *United States v. Rice*, 2013 WL 2299081 (D.C. Cir. May 26,

2013).  The D.C. Circuit rejected those arguments and affirmed his convictions.  *See United*

*States v. Rice*, 746 F.3d 1074 (D.C. Cir. 2014).  A timely motion to stay issuance of the mandate

was granted, pending a petition of writ of certiorari in the Supreme Court.  The Supreme Court

denied certiorari on November 10, 2014.  *Rice v. United States*, 135 S. Ct. 493 (2014).

16

After the Supreme Court denied certiorari, Mr. Rice continued to follow up with Wicks about raising his ineffective assistance of counsel claim in the § 2255 motion and asked when the motion was due.  Wicks Affidavit, ECF No. 969 at 6-7.  Wicks then (wrongly) told Mr. Rice the § 2255 motion was due on December 1, 2015—it was actually due November 10, 2015, one year after the Supreme Court denied certiorari.  *See id.*  As Wicks stated in a sworn affidavit to this Court:

> Mr. Rice continued to follow up with me.  He asked me when the 2255 would be due so I calculated the deadline and told him when the deadline was. . . . I calculated the 2255 . . . to be due 12/1/2015. . . . Mr. Rice relied entirely on my judgment as to the deadline.

*Id.*

Before the actual deadline, on October 30, 2015, Mr. Rice provided Wicks with a signed affidavit to support his § 2255 motion.  ECF No. 941-4.  In that affidavit, he explained how his trial counsel assured him that he was facing 168 to 210 months (that is, 14 to 17.5 years), not mandatory life, because he wrongly assured him that his prior drug convictions were too old to qualify him for the sentencing enhancements.  *See id.*

On November 10, 2015, Wicks missed the statutorily required deadline to file Mr. Rice's his § 2255 motion.  Instead, on November 28, 2015, Wicks filed his § 2255 motion where, for the first time, she raised his ineffective assistance of counsel claim.  ECF No. 941.  The problem, however, was that she filed the § 2255 motion 18 days *after* the statutory deadline, and failure to meet that statutory deadline precluded the Court from addressing the merits of his § 2255 motion.  *See* § 2255(f); *United States v. Rice*, 227 F. Supp. 3d 82, 84 (D.D.C. 2017) ("The AEDPA sets a one-year limitation for filing under § 2255.").

In addition, on November 28, 2015, Wicks filed a motion seeking appointment of new counsel, because she "has filed a 2255 motion on Mr. Rice's behalf but believes she is conflicted from further representation given that she is a potential witness and also represented codefendant Roland Bailey in this case at trial." ECF No. 942.

The Court then appointed Peter Cooper to represent Mr. Rice in his § 2255 motion. ECF No. 945. Mr. Cooper acknowledged Wicks filed the motion 18 days late, but argued that the deadline should be equitably tolled. ECF No. 969. This Court, in relying upon D.C. Circuit precedent indicating that the attorney's miscalculation of the deadline constituted "garden variety error," denied the motion as untimely. *Rice*, 227 F. Supp. 3d at 84 (relying upon *United States v. McDade,* 699 F.3d 499 (D.C. Cir. 2012)).

Gary Proctor assisted Mr. Rice *pro bono* with his appeal to the D.C. Circuit to argue that the filing deadline should be equitably tolled. Unlike Mr. Rice's prior appellate attorneys, Proctor relied upon a line of Supreme Court precedent exempting ineffective assistance claims from procedural default in habeas proceedings arising out of state court and argued that those cases should apply to § 2255 motions. However, "[b]ecause this argument was not presented to the district court below," the D.C. Circuit found "it is forfeited for this appeal, and we will not consider it." *United States v. Rice*, 727 Fed. Appx. 697, 702 (D.C. Cir. 2018).

Mr. Rice has been incarcerated since his arrest on November 12, 2003. He has served approximately 198 months (that is, 16.5 years) of his life sentence.

### III.   LEGAL PRINCIPLES

This Court has authority to order his compassionate release under 18 U.S.C.

§ 3582(c)(1)(A)(i).  This statute, first enacted as part of the Crime Control Act of 1984, granted

district courts authority to reduce a defendant's term of imprisonment where there were

"extraordinary and compelling reasons" warranting such reduction.  However, as originally

enacted, the statute only gave the court authority to grant compassionate release upon a motion

by the Director of the BOP.  *See* 18 U.S.C. § 3582(c)(1)(A)(i).  "The BOP rarely did so."  *United*

*States v. Rodriguez*, No. 2:03-cr-0271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020).

Frustrated at the BOP's miserly approach to compassionate release, Congress acted.  On

December 21, 2018, Congress enacted the First Step Act, a law aimed at "unwind[ing] decades

of mass incarceration."  *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019); *see*

*also* First Step Act, Pub. L. 115-391, § 603 (Dec. 21, 2018).  Of the First Step Act's many reform-

oriented provisions, one stood out: "Increasing the Use and Transparency of Compassionate

Release."  First Step Act § 603.  This provision took away BOP's exclusive authority to file

compassionate release motions, allowing individuals to file motions directly with the sentencing

court.  *See* § 3582(c)(1)(A)(i).

Now, when an individual files a compassionate release motion, a court may reduce a

sentence if three prongs are met:

1.  The individual has "fully exhausted his administrative remedies" or "there has been
    a lapse of thirty days from the warden's receipt of the defendant's request, whichever
    is earlier";

2.  "extraordinary and compelling reasons warrant" a sentence reduction; and

3.  the reduction is consistent with the § 3553(a) sentencing factors.

*See* § 3582(c)(1)(A)(i); *see also United States v. Johnson*, No. 15-cr-125-KBJ, 2020 WL 3041923, at

*1 (D.D.C. May 16, 2020) (setting forth the three relevant factors in the compassionate release

analysis).  As discussed below, Mr. Rice meets each prong.

### IV.  ARGUMENT

**A**. **Mr. Rice's compassionate release request is properly before this Court.**

Mr. Rice submitted a request for compassionate release to the warden of his BOP facility

on April 21, 2020, which was formally denied on May 14, 2020.[10]  *See* Ex. 9, BOP Denial.

Therefore, over 30 days have lapsed "from the received of such request by the warden of the

defendant's facility," making his motion properly before this Court.  *See* § 3582(c)(1)(A)(i).

**B.  Extraordinary and compelling reasons justify his compassionate release.**

To determine what constitutes "extraordinary and compelling circumstances," Congress

tasked the Sentencing Commission, in its organic statute, with developing criteria regarding "the

sentence modification provisions set forth in" § 3582(c)(1)(A) and describing what "should be

considered extraordinary and compelling reasons for a sentence reduction."  *See* 28 U.S.C.

§ 994(a)(2)(c), (t).

The Commission, in turn, set out various scenarios in which "extraordinary and

compelling reasons warrant the reduction," including when the defendant "is at least 65 years

old," "is experiencing a serious deterioration in physical or mental health because of the aging

process," and "has served at least 10 years . . . of his or her term of imprisonment."  *See* U.S.

Sentencing Guidelines Manual (U.S.S.G.) § 1B1.13 cmt.1(A)-(C) (2018).  The Commission

---

[10] In an abundance of caution, counsel submitted another request on May 8, 2020 but has not
received a response.

provided other examples as well, but recognizing they might not encompass the wide range of compelling reasons, the Commission added a catch-all—"other reasons"—which may act "in combination" with the prior categories or may be wholly independent.  *See* U.S.S.G. § 1B1.13 cmt. n.1(D).[11]

The Commission's policy statements were issued *before* the passage of the First Step Act and have not been amended to account for the statutory changes to § 3582, so courts have found they are now outdated.  Accordingly, courts have held that "the most sensible interpretation of the Sentencing Commission's guidance in light of Congress's recent statutory amendments is that 'the Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive.'"  *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *5 (D. Me. July 11, 2019)); *see also United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

Indeed, "a majority of district courts that have considered the issue" have concluded that, after passage of the First Step Act, compassionate release is not limited by the

---

[11] To the extent that Application Note 1(D) restricts "other reasons" to those "as determined by Director of BOP," it conflicts with the First Step Act's statutory amendments and does not apply.  *See United States v. Brantley*, No. 16-cr-144-TSC, ECF No. 158, at 2 n.1 (D.D.C. June 18, 2020); *United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019).  Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."  *United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *9 (M.D.N.C. June 28, 2019).

Commission's understanding of "extraordinary and compelling reasons," and courts can independently determine those reasons. *United States v. Young*, 2020 WL 1047815 (M.D. Tenn. Mar. 4, 2020) (citing lower court decisions); *see also United States v. Brantley*, No. 16-cr-144-TSC, ECF No. 158 (D.D.C. June 18, 2020) ("The statute itself does not constrain the meaning of 'extraordinary and compelling,' and the applicable Sentencing Guidelines policy statement specifically provides that in addition to particular health conditions and age, 'other reasons' can be considered."); *United States v. Haynes*, 2020 WL 1941478, at *14-15 (E.D.N.Y. Apr. 22, 2020) (joining the numerous courts "in concluding that it, too, has the authority . . . to determine what 'Other Reasons' . . . qualify as 'extraordinary and compelling' regardless of BOP's view on the matter and without having to await a someday-updating by the Commission of its unquestionably outdated policy statement").

In this case, there are multiple factors that, when taken together, courts have recognized constitute "extraordinary and compelling" reasons to grant Mr. Rice's compassionate release. Each reason will be addressed in turn.

> **i. Courts agree that Mr. Rice's harsh sentence, which is vastly out of line with similarly situated defendants and would no longer be statutorily required today, provides extraordinary and compelling reasons to reduce his sentence.**

Mr. Rice was convicted for being a non-violent, low-level drug dealer in a larger conspiracy. He was responsible for selling 1 kilogram of cocaine and 1 kilogram of heroin in Washington, D.C. *See* PSR ¶ 39. For this, he has effectively been sentenced to die in prison. This is an unduly harsh sentence. The leader of the drug conspiracy, who was personally responsible for smuggling more than 400 kilograms of cocaine and 10 kilograms of heroin into the United States, which were then distributed and sold all over the country, received 9 years and 2

months.  *See* ECF No. 320 at 4; ECF No. 733.  Murderers, rapists, and terrorists have received

lesser sentences than Mr. Rice's sentence of life imprisonment.  *See Rivera-Ruperto*, 884 F.3d at

32; *see also* U.S. Sentencing Comm'n, *Statistical Information Packet, Fiscal Year 2019*, D.C. Circuit

11 (Apr. 2020) (reporting that the national average sentence for drug trafficking was 76 months

and the D.C. Circuit average was 48 months).[12]

Of course, at the time of Mr. Rice's sentencing, this Court had no choice but to impose a

life sentence.  But his life sentence would not be statutorily mandated today.  The First Step Act

has changed the conditions under which the mandatory minimums apply by inserting new terms

into the statute.  Whereas, before, a prior "felony drug offense" triggered the mandatory

minimums,[13] that term has been changed to "serious drug felony" or "serious violent felony."

*See* First Step Act, Pub. L. 115-391, 132 Stat. 5194.

 To constitute a "serious drug felony," the conviction must:

1. Be "an offense described in 18 U.S.C. § 924(e)(2)," the Armed Career Criminal Act, which includes federal offenses under 21 U.S.C. § 801 et seq., 21 U.S.C. § 951 et seq., or 45 ch. 705, *or* state offenses for manufacturing, distributing, or possessing with intent to manufacture or distribute a controlled substance as defined in 21 U.S.C. § 802, *and* that have a maximum term of imprisonment of 10 years or more prescribed by law;

2. Have required the individual to serve "a term of imprisonment over 12 months"; *and*

3. ***The individual must have been released from that term of imprisonment "within 15 years of the commencement of the instant offense"***—i.e., unlike before, there is now an expiration date for serious drug offenses.

---

[12] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2019/dcc19.pdf.

[13] A "felony drug offense" was defined as "an offense that is punishable by imprisonment for more than one year . . . that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."  21 U.S.C. § 802(44).  This term was interpreted to mean any drug offense qualified, sentence length on the conviction did not matter, and the age of the conviction did not matter—i.e., there was no expiration for prior drug offenses.

*See* 21 U.S.C. § 802(57) (emphasis added).

To constitute a "serious violent felony," the conviction must:

1. Be an offense described in 18 U.S.C. § 133 or 18 U.S.C § 3559(c)(2); *and*

2. Have required the individual to serve a term of imprisonment over 12 months.

*See* 21 U.S.C. § 802(58).

Additionally, the First Step Act changed the mandatory minimum penalties:

1. If the defendant has no prior convictions for a "serious drug felony" or "serious violent felony," under § 841(b)(1)(A) or § 960(b)(1)(A), he would be subject to 10 years to life (as before).

2. If a defendant has *one* prior qualifying "serious drug felony" or "serious violent felony," § 841(b)(1)(A) and § 960(b)(1)(A) increase the mandatory minimum to 15 years (rather than 20 years, as before).

3. If the defendant has *two* or more prior qualifying convictions, § 841(b)(1)(A) increases the mandatory minimum to 25 years (rather than life).[14]

With these changes, Mr. Rice's life sentence would not be statutorily mandated today.

As a preliminary matter, the changes ended mandatory life imprisonment based on recidivism.

*See* § 841(b)(1)(A); § 960(b)(1)(A).

But more fundamentally, his two prior 1974 convictions that previously counted as

predicate "felony drug offenses" would not enhance his sentence at all because they are now too

old. He was sentenced for both drug convictions on May 20, 1974, to a term of 20 months to 5

years imprisonment. *See* PSR ¶¶ 56, 57. This means that he was released from custody, at the

latest, 5 years later on May 20, 1979.[15] These convictions could only enhance his sentence for the

---

[14] § 960(b)(1)(A) does not increase the mandatory minimum penalty if the person has two or more prior qualifying convictions.

[15] It is likely that he was released earlier than 5 years, but due to the age of these convictions, "information is no longer available" on either case from 1974. PSR ¶¶ 56-57.

next 15 years, until May 20, 1994.  Here, however, the instant conspiracy is alleged to have

started "on or about sometime in September, 1995." *See* Indictment, ECF No. 1.  Thus, neither

of his prior drug convictions would qualify to enhance his sentence.

Moreover, the Sentencing Guidelines would recommend a lower range today.  Without

the sentencing enhancements, his original guideline recommended 168 to 210 months based on a

total offense level of 32 and criminal history category IV.  *See* PSR ¶ 90.  In November 2014, the

Sentencing Commission amended the sentencing guidelines to retroactively reduce the base

offense levels for certain drug offenses by two levels.  *See* U.S. Sentencing Comm'n, Amendment

782 (2014).  That two-level reduction would apply to Mr. Rice and reduce his base offense level

from 32 to 30.  *Compare* U.S.S.G. § 2D1.1(c)(4) (2005) (reporting a base offense level of 32 for

offenses involving between 1,000 and 3,000 kilograms of marijuana), *with* U.S.S.G. § 2D1.1(c)(5)

(2018) (reporting a base offense level of 30 for offenses involving between 1,000 and 3,000

kilograms of marijuana).  Based on total offense level 30 and criminal history IV, if sentenced

today, the guidelines would recommend 135 to 168 months.

The following chart summarizes the gross disparity between the sentence Mr. Rice

received and the sentence he would likely receive today:

| How Mr. Rice's sentence would change if sentenced today | | |
|---|---|---|
| **Components** | **Before** | **Today** |
| Ordinary Guideline range | 168 to 210 months | 135 to 168 months |
| Career Offender enhancement | N/A | N/A |
| § 851 enhancement based on 1974 drug convictions | Life | N/A |
| **Guideline recommendation** | **Life** | **135 to 168 months** |

The change in the law to substantially decrease Mr. Rice's sentence reflects years of

efforts by a broad cross-section of American leaders who worked to ensure "that each

punishment fits the crime and that taxpayer dollars are not wasted locking up people who pose no threat to public safety." *See* DeMint et al., Conservative Leaders' Letter to United States President Donald Trump, Dec. 1, 2018, *reprinted in* 31 Fed. Sent. R. 160, 2018 WL 6928332. The injustice of a mandatory life sentence, which is clearly longer than what Congress now deems warranted, constitutes "extraordinary and compelling reasons" that warrant compassionate release.

In *Curtis*, Chief Judge Howell recently granted compassionate release to a 43-year-old defendant who had served 17 years of a life sentence for sex trafficking minors. Chief Judge Howell granted release, in part, because

> [i]f defendant were sentenced today, he thus would not be subject to an enhanced sentence [by the career offender guideline]. . . . ***That a defendant sentenced today, identical in every way to the defendant in this case, would face 15.5-19.5 years' imprisonment is strong evidence that defendant's 17 years' imprisonment adequately reflects the "seriousness of his offense" and "provides just punishment for the offense."***

*United States v. Curtis*, 2020 WL 1935543, at *4 (D.D.C. Apr. 22, 2020) (emphasis added).

Similarly, in *Smith*, Judge Chutkan recently granted compassionate release to a defendant primarily "to make his sentence consistent with the D.C. Circuit's recent holding that the applicable provision of the career offender guideline 'clearly excludes inchoate offenses.'" *United States v. Smith*, 14-cr-189-TSC, ECF No. 76, at 4 (D.D.C. May 14, 2020) (citing *United States v. Winstead*, 890 F.3d 1082, 1091 (D.C. Cir. 2018)). In both cases, the changes in the sentences did not apply retroactively; nevertheless, both cases relied upon the non-retroactive changes when granting compassionate release.

Judges Howell and Chutkan are not alone in granting compassionate release to correct unjustly harsh sentences. In the short time since the First Step Act was passed, courts around

the country have granted compassionate release in situations where the law had (non-retroactively) changed to substantially decrease a defendant's overly harsh sentence.[16]  A non-exhaustive list includes:

| Courts Granting Compassionate Release Due to (Non-Retroactive) Changes in Sentencing | |
|---|---|
| **Court** | **Decision** |
| *United States v. Brown*, No. 4:05-cr-00227-1, 2020 WL 2091802, at *2, 10 (S.D. Iowa Apr. 29, 2020) | Granting compassionate release to a 43-year-old defendant who had served approximately 15 years of a 42.5-year sentence for drug and firearm offenses because of "Defendant's rehabilitation, *draconian sentence*, and particularized health risks [low white blood cell count and hypertension] amid a global pandemic," even though "Defendant's facility . . . is yet to confirm a case." |
| *United States v. Maumau*, No. 2:08-CR-758-TC, 2020 WL 806121, at *5 (D. Utah Feb. 12, 2020) | Granting compassionate release to a 30-year-old defendant who had served 10 years of a 55-year sentence for Hobbs Act robbery, assault with a dangerous weapon in aid of racketeering, and firearm offenses primarily because of "the fact that he would not receive |

---

[16] *See, e.g.*, *United States v. Scott*, No. CCB-94-0202, 2020 WL 2467425 (D. Md. May 13, 2020) (finding that the disparity between the sentence defendant received and what he would receive today after the First Step Act's changes to § 924(c) constituted an "extraordinary and compelling reason" to reduce defendant's sentence); *United States v. Bryant*, No. CR 95-202-CCB-3, 2020 WL 2085471 (D. Md. Apr. 30, 2020) (same); *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478 (E.D.N.Y. Apr. 22, 2020) (granting compassionate release based on the severity of the original sentence and changes in § 924(c) sentencing); *United States v. Defendant(s)*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906 (C.D. Cal. Apr. 13, 2020) (granting compassionate release on the bases of changes in § 924(c) sentencing and post-sentencing rehabilitation); *United States v. Decator*, Crim. No. CCB-95-0202, 2020 WL 1676219, at *3 (D. Md. Apr. 6, 2020) (finding "extraordinary and compelling" reason justifying sentence reduction due to changes in § 924(c) sentencing); *United States v. Owens*, No. 97-CR-2546-CAB, ECF 93 at 5 (S.D. Cal. Mar. 20, 2020) (same); *United States v. O'Bryan*, No. 9610076-03-JTM, 2020 WL 869475, at *1 (D. Kan. Feb. 21, 2020) (same); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *2 (D. Neb. Nov. 14, 2019) (same); *United States v. Cantu-Rivera*, 2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019) (granting compassionate release, partly due to changes in § 841(b)(1)(A) sentencing, to a 69-year-old defendant with underlying health conditions).

| | the same sentence if the crime occurred today."[17] |
|---|---|
| *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493 (E.D. Va. Mar. 16, 2020) | Granting compassionate release to a 64-year-old defendant, without a medical condition, who had served approximately 20 years of a 50-year sentence for several armed bank robberies because the 50 years was mostly attributable to the practice of "stacking" under § 924(c), which had since been (non-retroactively) eliminated by the First Step Act. |
| *United States v. Young*, No. 2:00-cr-002, 2020 WL 1047815 (M.D. Tenn. Mar. 4, 2020) | Granting compassionate release to a 72-year-old defendant suffering from diabetes, high blood pressure, and chronic kidney disease who had served 20 years of a 92-year sentence mostly attributable to the practice of "stacking" under § 924(c), in part, because "he would be subject to a mandatory minimum sentence of 25 years, rather than 92."[18] |

Tying these cases together are at least two common denominators: 1) The First Step Act's changes in sentencing; and 2) the judge's finding that, despite non-retroactivity, the changes in sentencing constitute "extraordinary and compelling reasons" for a sentence reduction.

Mr. Rice would not be sentenced to mandatory life today, and, in fact, is now serving a sentence at least 2.5 years longer than the guidelines deem warranted, which represents an "extraordinary and compelling reason" to grant Mr. Rice a sentence reduction to time served.

---

[17] The *Maumau* decision ordered a resentencing hearing where the court ultimately imposed a time served sentence amounting to 10 years.  *See id.*, ECF No. 1769.

[18] The *Young* decision ordered a resentencing hearing where the court ultimately imposed a time served sentence amounting to 20 years.  *See id.*, ECF No. 109.

ii.   **The government's decision to seek mandatory life, in contravention of Congress's intent, provides extraordinary and compelling reasons to reduce his sentence.**

Not only is Mr. Rice's life sentence unduly harsh today, it was unduly harsh at the time of his original sentencing, because Mr. Rice has never been the type of individual Congress sought to subject to mandatory life.  At the time, § 841(b)(1)(A) imposed escalated penalties depending on the defendant's criminal history:

1.  If the defendant had no prior convictions for a "felony drug offense," he would be subject to 10 years to life in prison.

2.  If the defendant had *one* prior conviction for a "felony drug offense," his minimum sentence would increase from 10 years to 20 years.

3.   If the defendant had *two* prior convictions for a "felony drug offense," his minimum sentence would increase to mandatory life.

The statute, as enacted in 1970, escalated the mandatory minimum sentence based on one's prior criminal history in order to deter recidivism.  Even so, § 851 demonstrates congressional and DOJ recognition "that a prior drug felony conviction was not *per se* evidence that a drug trafficking defendant was the sort of *hardened professional criminal* who deserves an enhanced mandatory sentence."  *United States v. Kupa*, 976 F. Supp. 2d 417, 427 (E.D.N.Y. 2013) (emphasis added).  In other words,

> Congress left it to prosecutors to identify the defendants who truly deserved the enhancements that remained after 1970. Whereas the previous statutory scheme made no distinctions among (for example) professional criminals, street-corner dealers, and addicts . . . § 851 trusted prosecutors to take into account such individual circumstances, vesting them with the power to be selective.

*Id.*

In Mr. Rice's case, however, the government ignored those distinctions and failed to exercise the power to be selective.  Mr. Rice played a relatively minor, non-violent role, as a street dealer in Washington, D.C.  He had no decision-making authority, did not exercise control

29

over anyone, did not recruit other dealers to join the conspiracy, did not receive any share of the larger profits, and aside from selling drugs, did not physically harm anyone.  *See* PSR ¶ 40.  He became involved in the conspiracy in order to better provide for his family.  *See* Ex. 1, Anthony Rice Letter at 2.  And, yet, he received a sentence far greater than the sentences of "hardened professional criminals" higher up the conspiracy's chain of command.

Moreover, the application of mandatory life in this case had little to do with recidivism. Mr. Rice had two prior felony drug convictions from 1974, which occurred 29 years before his arrest in the instant offense.  And back in 1974, there was no intervening arrest or conviction between his two drug sales.  Rather, Mr. Rice sold drugs to an undercover officer with no consequences; three days later, he did it again.  At sentencing in this case, the government acknowledged that it was very likely that Mr. Rice's 1974 offenses would have been charged as a single offense in 2006, but because they were charged as two separate offenses in 1974, they counted as two separate offenses for the purposes of imposing a mandatory life sentence.  Sent'g Tr. at 25-26.  That acknowledgment shows that the decision to seek mandatory life was not rooted in justice.  Nor was it to deter recidivism.  Rather, it was an "arbitrary and capricious infliction of . . . grossly excessive drug punishments."[19]  And that gives this Court an extraordinary and compelling reason to correct this injustice.

Indeed, the decision to file § 851 enhancements in this case and seek mandatory life represents a practice that has received wide condemnation from all segments of the legal

---

[19] Mark W. Bennett, *Addicted to Incarceration: A Federal Judge Reveals Shocking Truths About Federal Sentencing and Fleeting Hopes for Reform*, 87 UMKC L. Rev. 3, 15 (2018); *see also United States v. Young*, 960 F. Supp. 2d 881 (N.D. Iowa 2013) (describing the arbitrary workings of § 851 enhancements).

community for decades.  Former Attorney General Eric Holder, while in office, spoke out against

some of the ways in which prosecutors were filing § 851 enhancements, stating that "[i]n some

cases, mandatory minimum and recidivist enhancement statutes have resulted in unduly harsh

sentences and perceived or actual disparities that do not reflect [the] Principles of Federal

Prosecution."[20]  He specifically instructed prosecutors to stop filing § 851 sentencing

enhancements unless the case was particularly egregious, reminding federal prosecutors that they

"must assure that our most severe mandatory minimum penalties are reserved for serious, high-

level, or violent drug traffickers."  *Id.*  By contrast, "[l]ong sentences for low-level, non-violent

drug offenses do not promote public safety, deterrence, and rehabilitation."  *Id.*

Former Judge J. Lawrence Irving (S.D. Cal.) resigned from the bench after observing that

"the system is run by the U.S. attorneys."[21]  The "increased prosecutorial power," which in

turn has led to "increasingly harsher sentences for drug defendants," created what he called an

"absurd" situation that he could no longer stomach.[22]  He is not alone.  Federal judges across the

country have described their role when doling out "cruel,"[23] "unjust,"[24] "fiscally

---

[20] Office of the Attorney Gen., *Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases* 1 (Aug. 12, 2013), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/ag-memo-department-policyon-charging-mandatory-minimum-sentences-recidivist-enhancements-in-certain-drugcases.pdf.

[21] Mary Flaherty & Joan Biskupic, *Rules Often Impose Toughest Penalties on Poor, Minorities*, Wash. Post (Oct. 9, 1996), https://www.washingtonpost.com/archive/politics/1996/10/09/rules-often-impose-toughest-penalties-on-poor-minorities/19029236-3d2d-4dbd-a3fa-d22436438967.

[22] *Id.*

[23] *United States v. Kupa*, 976 F. Supp. 2d 417, 453 (E.D.N.Y. 2013).

[24] *Id.* at 455.

irresponsible,"[25] "racially discriminatory,"[26] "draconian,"[27] "and even irrational"[28] mandatory minimum sentences as that of a "computer, automatically imposing sentences without regard to what is right and just."[29]

Judge Terry J. Hatter Jr. (C.D. Cal.), among others, have criticized how mandatory minimums and § 851 enhancements result in striking racial disparities: "[A]lmost every Monday . . . I'm asked to pass out sentences that carry mandatory minimums of 20 years, 40 years and sometimes life without the possibility of parole, and it's always to a young minority male—always."[30]  The Sentencing Commission corroborates this observation, as it found that Black defendants were disproportionately affected at every stage of the § 851 process—"whether the offender is eligible, if so, *whether the 851 information was filed*, and lastly, whether the offender remained subject to an enhanced mandatory minimum penalty."[31]

---

[25] *Id.*

[26] *Id.*

[27] Jed Rakoff, *Judge Rakoff Speaks Out at Harvard Conference: Full Speech,* Bloomberg Law (Apr. 13, 2015), https://news.bloomberglaw.com/business-and-practice/judge-rakoff-speaks-out-at-harvard-conference-full-speech.

[28] *United States v. Angelos*, 345 F. Supp. 2d 1227, 1230 (D. Utah 2004); *see also United States v. Gonzalez-Ramirez*, 561 F.3d 22, 31 (1st Cir. 2009) (Merritt, J., concurring) (noting that the prosecutor's decision to file a § 851 enhancement that doubled the mandatory minimum from 10 to 20 years "passes all understanding").

[29] *United States v. Madkour*, 930 F.2d 234, 239 (2d Cir. 1991).

[30] Mary Flaherty & Joan Biskupic, *Rules Often Impose Toughest Penalties on Poor, Minorities*, Wash. Post (Oct. 9, 1996).

[31] U.S. Sentencing Comm'n, *Application and Impact of 21 U.S.C. § 851: Enhanced Penalties for Federal Drug Trafficking Offenses* 36 (July 2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2018/20180712_851-Mand-Min.pdf (emphasis added).

Former Judge John Gleeson (E.D.N.Y.), who served as a longtime federal prosecutor, penned a lengthy opinion specifically dedicated to assailing the DOJ's use of § 851 enhancements. *See United States v. Kupa*, 976 F. Supp. 2d 417 (E.D.N.Y. 2013). Judge Gleeson provided examples of § 851 enhancements' "truly egregious miscarriages of justice," one of which has striking similarities to this case:

- In 2002, Dennis Capps, a methamphetamine addict, pled guilty to trafficking a small amount of drugs. He went on to become a model prisoner and a model probationer, according to his judge. A decade later, he relapsed into substance abuse and was again caught with drugs. He refused a plea bargain, and so federal prosecutors filed a § 851 enhancement to count his conviction from 2002, which actually covered *two offenses that occurred a month apart*. Instead of receiving the 10-year mandatory minimum that his most recent offense required, the filing of a § 851 enhancement required his judge—against her wishes—to sentence Capps to life in prison without the possibility of parole.

*Id.* at 442-43.

***This case embodies all the manifest injustices described above.*** It bears repeating that Mr. Rice has been sentenced to die in prison for engaging in low-level, non-violent drug deals in Washington, D.C. He has this sentence because federal prosecutors filed a § 851 enhancement to count his convictions from 1974, which occurred 29 years before the instant offense and covered *two offenses that occurred three days apart*. This is an "unjust, counterproductive, fiscally irresponsible and racially discriminatory" sentence. *Id.* at 455. Mr. Rice's mandatory life sentence has inflicted collateral damage on his family and deprived him of the opportunity to spend his few remaining years with his wife, children, grandchildren, and siblings. *Cf. United States v. Haynes*, 557 F. Supp. 2d 200, 203 (D. Mass. 2008) (Gertner, J.) ("Courts may no longer ignore the possibility that mass incarceration of nonviolent drug offenders has disrupted families and communities . . . without necessarily deterring the next generation of young men from

committing the same crimes.").  With the passage of the First Step Act, however, this Court is

now empowered for the first time to correct this manifest injustice.

        **iii.**    **The high likelihood that Mr. Rice would have successfully raised an ineffective assistance of counsel claim, had it not been procedurally precluded, provides extraordinary and compelling reasons to reduce his sentence.**

      Mr. Rice's defense attorneys share in the blame for this injustice.  Most notably, his trial

attorney, Grandison Hill, did not properly advise him that he faced mandatory life if he

proceeded to trial.[32]  Then, his appellate and post-conviction attorney, Jennifer Wicks, missed

the statutory filing deadline to raise Mr. Rice's ineffective assistance claim by 18 days, thereby

precluding Mr. Rice from challenging his trial attorney's ineffectiveness.  *See* Wick's Affidavit,

ECF No. 969 at 6; ECF No. 941; *United States v. Rice*, 227 F. Supp. 3d 82, 84 (D.D.C. 2017).

These failures, at each significant step of the process, provide this Court with additional

"extraordinary and compelling" reasons that warrant his compassionate release.

      Although an evidentiary hearing never occurred on the matter, the evidence already on

the record strongly suggests that Hill fundamentally misunderstood the law regarding § 851

enhancements and inaccurately informed Mr. Rice of his sentencing exposure.  This is first

evidenced by when this Court asked Hill whether he received the government's § 851 notice, and

he responded "I did receive that.  And I went over that.  And it is our position – I think we

addressed this earlier, it is our position that it was untimely."  Tr., ECF No. 941-5 at 4.  Given

---

[32] In addition, both of Mr. Rice's appellate counsel, Jennifer Wicks and Gary Proctor, noted that they believed Hill failed to conduct any pretrial investigation.  *See* Appellant's Br., *United States v. Rice*, CA No. 17-3007, at 24 n.8 (D.C. Cir. Nov. 8, 2017).  Inadequate pretrial investigation is another ground that can give rise to an ineffective assistance of counsel claim.  *See e.g.*, *Browning v. Baker*, 875 F.3d 444, 470-76 (9th Cir. 2017); *Chester v. Vannoy*, No. 16-17754, 2018 WL 2970912, at *52 (E.D. La. 2018).

that § 851 only requires the notice to be filed before trial, and that the government provided

notice in this case seven months before trial, Hill's contention that the notice was "untimely"

makes no sense, other than it reflects a fundamental misunderstanding of the law.  *See* § 851(a)(1)

(requiring that the government provide notice "before trial, or before entry of a plea of guilty").

Alternatively, Hill's comment could be interpreted to show that he erroneously believed

Mr. Rice's prior convictions had become too old and "untimely" under § 841(b)(1)(A).  Indeed,

that is what Mr. Rice has maintained Hill told him.  *See* Rice Affidavit, ECF No. 941-4 at 2 ("Mr.

Hill explained to me that these two convictions would not count as two because they were

consolidated for sentencing and because they were so old. . . . It was my understanding, because

neither of my narcotics convictions could be used, that I was facing 168 to 210 months after

trial.").  But, again, if Hill believed that prior convictions could become "untimely," that too

reflects a fundamental misunderstanding of the law—at the time, prior convictions did not age

out under § 841(b)(1)(A).  No matter how one interprets Hill's comment, it leads to the same

conclusion: he did not understand that Mr. Rice faced mandatory life and, therefore, could not

convey that information to him.[33]

---

[33] The only other plausible explanation for Hill's comment is that it was in response to the
government's allegation in its § 851 notice that Mr. Rice qualified as a career offender under
§ 4B1.1 of the Sentencing Guidelines.  *See* Gov't Notice, ECF No. 277 at 2 ("Defendant is
further noticed that . . . defendant is a career criminal subject to the enhanced penalties set forth
in § 4B1.1 of the [U.S.S.G.].").  On that issue, Hill would be correct; Mr. Rice's prior
convictions were too old under § 4B1.1 and, thus, "untimely."  *See* U.S.S.G. §§ 4B1.2, cmt. n.3,
4A1.2(e)(1)-(3).  However, Hill's wholesale objection to the § 851 notice as "untimely" only
shows that he was oblivious to the "800-pound gorilla" in the room—the § 851 notice was not
untimely as it related to the mandatory life § 841 enhancements.  *Kupa*, 976 F. Supp. 2d at 459.
So, even under this scenario, it is clear that Hill did not understand Mr. Rice faced mandatory
life.

There is additional evidence at sentencing that Hill failed to inform Mr. Rice of his sentencing exposure. Mr. Rice's sentencing attorney, Veta Carney, immediately informed the Court that he did not know he faced a mandatory life sentence. Specifically, only one week after the government filed its sentencing memorandum stating "defendant is facing a mandatory sentence of life without parole," ECF No. 499, Ms. Carney sought a continuance of the sentencing hearing and alluded to Hill's faulty advice:

> Defendant . . . denies that he has two previous qualifying convictions for a drug offense. Based on the unavailability of the court records and *the age of the prior convictions*, the defendant needs additional time to seek these materials . . . . *In addition, defendant notes that . . . he was not advised of the possibility of mandatory life by his former counsel or the Court.*

ECF No. 501 at 2-3 (emphasis added). Ms. Carney referred to Hill's faulty advice again at sentencing:

> [Mr. Rice] says he . . . didn't know what was the content [of the § 851 notice] . . . . [T]rial counsel clearly did not understand the notice and, therefore, could not properly discuss this with Mr. Rice . . . . [T]he red flag . . . at the hearing on this about the notice was that counsel misadvised the defendant, talking about it being untimely. . . . [Mr. Rice] adamantly denies having any knowledge about facing mandatory life.

Sent'g Tr. at 3, 4, 17-18.

Additionally, the government itself later implied that Mr. Rice rejected plea offers because of Hill's faulty advice:

> Defendant also received notice from the government that it would be seeking enhanced penalties due to defendant's previous convictions; ***however, defendant decided to move forward*** with his motion to bar prior convictions ***due to untimeliness rather than accept the plea offer extended by the government***.

*See* ECF No. 959 at 2 (citing Sent'g Tr., ECF No. 941-5 at 4) (emphasis added).

36

Lastly, Mr. Rice has consistently maintained that he was informed that he faced a guideline range of 168 to 210 months—it is no coincidence that this range is the applicable guideline range had the enhancements not applied. ECF No. 941-4 at 2 ("It was my understanding, because neither of my narcotics convictions could be used, that I was facing 168 to 210 months after trial."). Given all the above, it is highly likely that Mr. Hill performed deficiently by inaccurately informing Mr. Rice of his sentencing exposure.

It is well-settled that Mr. Rice's right to effective assistance of counsel includes the right to receive competent advice during plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012); *Missouri v. Frye*, 566 U.S. 134, 140 (2012); *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010). During this critical stage of a criminal proceeding, ineffective assistance occurs if counsel did not inform the defendant of the "worst-case scenario if he rejected the plea and went to trial" and there is a "reasonable probability that the 'outcome of the plea process would have been different with competent advice.'" *See United States v. Aguiar*, 894 F.3d 351, 359-61 (D.C. Cir. 2018) (discussing the deficient performance and prejudice prongs of ineffective assistance of counsel claims) (quoting *Lafler*, 566 U.S. at 163); *see also United States v. Thorpe*, No. 13-cr-131-RJL, 2019 WL 1117197, at *8-9 (D.D.C. 2019) (deficient performance when counsel unaware and did not disclose to defendant federal charges that resulted in a longer sentence).

There is no indication that Hill warned Mr. Rice of the "worst-case scenario" he would face at trial while he rejected the government's offers. While it may be true that Mr. Rice never gave "any inclination" that he wanted to plead guilty, the calculus on whether to plead is substantially different when facing a 17.5-year guideline maximum as opposed to mandatory life. Sent'g Tr. at 10; *Byrd v. Skinner*, 940 F.3d 248, 258 (6th Cir. 2019) (defendant proceeding to trial

was "rooted in misinformation gleaned from his counsel's faulty advice, making it an unreliable metric of reasonably probable outcomes"); *Crawford v. Fleming*, 323 F. Supp. 3d 1186, 1197-98 (D. Or. 2018) ("Had petitioner been advised that the plea offer [~ 16.5 years] would result in a significantly shorter sentence than that one imposed after conviction [33 years], petitioner would have pursued settlement negotiations.").

Indeed, Mr. Rice has stated that if he knew his true sentencing exposure, he would have accepted the government's plea offer of 17 years.  *See* Rice Affidavit, ECF No. 941-4 at 2.  There is no reason to believe the Court would have rejected this plea agreement had it occurred—it accepted all 13 plea agreements related to this case, including those for co-defendants higher up in the conspiracy.  *E.g.*, Paulino-Feliciano Plea Agreement, ECF No. 319.

Simply put, if Mr. Rice received competent advice, there is a substantial probability that an alternative outcome to life in prison would have occurred.[34]  However, he never received an evidentiary hearing for his claim, not because of a lack of evidence, but because his subsequent counsel failed to submit a § 2255 motion in a timely manner.[35]  Mr. Rice's trial counsel's failure to accurately inform him of his true sentencing exposure, paired with his post-conviction counsel's failure to raise the ineffective assistance of counsel claim because she missed the filing

---

[34] Because of his life sentence, Mr. Rice is ineligible for good-time credit.  *See* 18 U.S.C. § 3624(b)(1).  However, had he accepted the 17-year plea agreement, he would have earned approximately 810 days (~ 2.2 years) of good-time credit after year 15 based on his sparse disciplinary history, thus qualifying him for release approximately 1.5 years ago.  *See id.*; Ex. 8, Progress Reports at 3-4 ("Rice has only received one incident report, which was in 2009.").

[35] Wicks may have provided ineffective assistance as appellate counsel for her failure to raise the ineffective assistance of trial counsel claim in the direct appeal.  At the time, it was recognized that such claims could be raised in direct appeals.  *See United States v. Rashad*, 331 F.3d 908 (D.C. Cir. 2003).  And there is no recognizable strategy here—the decision *not* to raise an ineffective assistance of a claim on direct appeal so that it could be later raised in an *untimely* § 2255 motion is not a recognizable strategy.

deadline, presents another extraordinary and compelling reason to grant Mr. Rice's compassionate release.

>        iv.    **Courts agree that Mr. Rice's age, medical vulnerabilities, and Covid-19 provide extraordinary and compelling reasons to reduce his sentence.**

Mr. Rice's advanced age of 72 years and his medical vulnerabilities—including diabetes, hypertension, chronic kidney disease, hyperlipidemia, latent tuberculosis, and diabetic retinopathy—put him in great danger of dying from Covid-19 and constitute additional extraordinary and compelling reasons to grant his compassionate release.  Ex. 10, Medical Records at 1-2; *see also United States v. Powell*, No. 1:05-cr-0061-ESH, ECF No. 78 (D.D.C. June 18, 2020) (concluding that 41-year-old defendant's medical condition, which places him at higher risk of serious illness or death from Covid-19, constitutes extraordinary and compelling reason warranting compassionate release).

As the Court is well aware, Covid-19 has caused a worldwide pandemic.  Covid-19 has infected over 9 million people globally, with over 2.3 million infections and 120,128 deaths in the United States.[36] A month ago, the epidemic surpassed a ghastly milestone: 100,000 Americans dead, all in under 4 months.[37]  In that window, the virus has proven beyond question it can penetrate prison walls with ease, despite BOP's well-intentioned efforts.  As of June 23, 2020, the virus has infected 6,324 prisoners in BOP custody and killed 87.[38]

---

[36] Global and United States numbers are obtained from https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html on a daily basis (last visited June 22, 2020).

[37] Media Statement, CDC, *United States Coronavirus (COVID-19) Death Toll Surpasses 100,000* (May 28, 2020), https://www.cdc.gov/media/releases/2020/s0528-coronavirus-death-toll.html.

[38] BOP numbers are obtained from https://www.bop.gov/coronavirus on a daily basis (last visited June 23, 2020).

These numbers are undoubtedly an undercount because the BOP has not performed adequate testing.  So far, the BOP has tested approximately 11 percent of all federal prisoners.[39] And of those tested, more than one of every three came back positive, strongly suggesting that there are far more undetected Covid-19 cases.[40]  At FCI Loretto, where Mr. Rice is located, only 24 tests have been completed where the prison houses 896 inmates—i.e., only 2 percent of inmates have been tested.[41]  Thus, while the BOP presently reports that there are no reported positive cases at FCI Loretto, its report "is not reassuring, given that there is no facility-wide testing being done there to separate those with COVID-19 from those who do not."  *United States v. Regas*, 2020 WL 2926457, at *3 (N.D. Nev. June 3, 2020).  Given the BOP's inadequate testing, courts have rejected the BOP's reassurances:

| Courts Rejecting BOP's Assurances that Facility Has No Positives | |
|---|---|
| **Court** | **Decision** |
| *U.S. v. Amarrah*, --F. Supp.3d--, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020) | "Zero *confirmed* Covid-19 cases is not the same thing as zero Covid-19 cases. The Bureau of Prisons recently discovered this when it found that 70 percent of the inmates it tested were positive for the disease."<br><br>"[U]nless and until [the BOP] implements a universal testing regimen, the Court gives no weight to the zero 'confirmed' Covid-19 case statistic—particularly because the BOP is housing detainees together. . . ." |

---

[39] Those tested amount to just 11% of the 163,441 inmates at BOP facilities.  *See* BOP, *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus (last visited June 23, 2020).

[40] 40 Luke Barr, *More than 1 out of 3 Tested Federal Inmates Were Positive for Coronavirus*, ABC News (June 16, 2020), https://perma.cc/J7PA-ERDC.

[41] *See* BOP, *COVID-19 Inmate Test Information*, https://www.bop.gov/coronavirus (listing 19 completed tests and 7 pending tests) (last visited June 23, at 4:30 p.m.).

| | "To the contrary, the Court finds that the lack of testing aggravates its concerns about Defendant's likelihood to contract Covid-19 while in federal custody."<br><br>"This disease spreads asymptomatically, which means the Court and the prison system can take no comfort in a lack of confirmed cases, and all parties should be deeply concerned by the lack of universal testing of inmates and staff." |
|---|---|
| *U.S. v. Agomuoh*, 2020 WL 2526113, at *9 (E.D. Mich. May 18, 2020) | As to the lack of confirmed Covid-19 cases at this facility, "the Court accords no weight to this statistic without evidence [this facility] implemented a universal testing regimen." |
| *U.S. v. McIndoo*, --F. Supp.3d--, 2020 WL 2201970, at *4 (W.D.N.Y May 6, 2020) | Noting the "prison has no idea how many of its inmates have contracted the virus given the lack of adequate testing." |
| *U.S. v. Pabon*, --F. Supp.3d--, 2020 WL 2112265, at *5 (E.D. Pa. May 4, 2020) | "Because the BOP has tested so few inmates, however, these statistics almost certainly underestimate the true number of infections and the number of affected BOP facilities." |
| *U.S. Locke*, 2020 WL 3101016, at *4 (W.D. Wash. June 11, 2020) | "However, this representation is made without the benefit of mass testing or even the benefit of the numbers tested. It appears we have no accurate accounting of the presence or absence of the disease at the institution," so "the Court is uncertain if it is getting an accurate picture of Covid-19 circumstances at [this facility]." |

In response to this unprecedented crisis in our prisons, the government has recently adopted the position that those with documented medical vulnerabilities that put them particularly at risk of Covid-19 are eligible for compassionate release. *See, e.g.*, *Wise v. United States*, No. CR ELH-18-72, 2020 WL 2614816, at *7 (D. Md. May 22, 2020) ("[J]ust last week, the Department of Justice adopted the position that any inmate who suffers from the chronic

conditions associated with severe illness from COVID-19 are eligible for compassionate release.").[42]

Mr. Rice is particularly vulnerable and meets the government's own criteria.  ***First***, Mr. Rice is 72 years old—an age that makes the risk of him dying in prison palpable.[43]  The scientific data is unequivocal: the elderly are at the highest risk of dying from Covid-19.  The CDC reports that "8 out of 10 deaths reported in the U.S. have been adults 65 years old and older" and "31-59% of adults 65-84 years old with confirmed COVID-19 have required hospitalization."[44]  Based on a sample of 44,000 confirmed cases in China, older persons in Mr. Rice's age group (70-79 years) were more than twice as likely to die of Covid-19 as persons in their 60s and more than six times as likely to die as persons in their 50s.[45]  Thus, Mr. Rice's advanced age, by itself, warrants compassionate release during this crisis.  *See United States v. Carter*, No. 16-cr-156 (TSC), ECF No. 48 (D.D.C. June 10, 2020) (granting compassionate release to a 76-year-old defendant who "has no other documented health issues").

---

[42] *See also United States v. Wright*, No. CR TDC-17-0388, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) ("The Government now agrees, based on recent Department of Justice guidance, that Wright's diabetes condition, and perhaps other medical conditions she presently has, could constitute 'extraordinary and compelling reasons' under the circumstances of the COVID-19 pandemic."); Gov't Resp. in Opp'n to Def.'s Mot. to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), *United States v. Hird*, Case No. 2:13-cr-39-TJS, Dkt. No. 650 (E.D. Pa. May 19, 2020) (government concession that "the risk of COVID-19" to a vulnerable inmate "presents a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility").

[43] *Inmate Age*, Fed. Bureau of Prisons (last updated June 13, 2020) https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (showing that 2.8 percent of BOP inmates are over the age of 65).

[44] *Coronavirus Disease 2019, Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[45] *Coronavirus: Largest Study Suggests Elderly and Sick Are Most at Risk*, BBC (Feb. 18, 2020), https://www.bbc.com/news/world-asia-china-51540981.

*Second*, Mr. Rice suffers from Type 2 diabetes, with which he was diagnosed in 2014, eleven years into his current sentence. *See* Ex. 10, Medical Records at 2. Diabetes is recognized as "***one of the most important comorbidities linked to the severity of all three known human pathogenic coronavirus infections.***"[46] The CDC has found that those with "[d]iabetes, including type 1, type 2, or gestational," are at higher risk for severe illness or death from Covid-19.[47] Indeed, the most recent CDC data shows that those, like Mr. Rice, with underlying health conditions such as diabetes are six times more likely to be hospitalized and twelve times more likely to die due to Covid-19 than otherwise healthy individuals.[48] Thus, Mr. Rice's diabetes, alone, also substantially increases his risk of severe illness and death from Covid-19. *See United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (finding extraordinary and compelling reasons where inmate had "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19"); *Rodriguez*, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (discussing how CDC statistics relating to diabetes, "which focus on the non-prison population . . . become even more concerning when considered in the prison context," because "[p]risons are tinderboxes for infectious disease"); *cf. United States v. Jennings*, No. 18-cr-017 (TSC), ECF No. 30 at 6 (D.D.C. Apr. 22, 2020) ("Jennings' advanced

---

[46] Stefan R. Bornstein et al., *Practical Recommendations for the Management of Diabetes in Patients with COVID-19*, 8 Lancet: Diabetes & Endocrinology 546, 546-47 (2020), https://www.thelancet.com/action/showPdf?pii=S2213-8587%2820%2930152-2 (describing the interplay of diabetes and Covid-19).

[47] *Groups at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[48] Lena H. Sun, *Patients with Underlying Conditions Were 12 Times as Likely to Die of Covid-19 as Otherwise Healthy People, CDC Finds*, Wash. Post. (June 15, 2020), https://www.washingtonpost.com/health/2020/06/15/patients-with-underlying-conditions-were-12-times-more-likely-die-covid-19-than-otherwise-healthy-people-cdc-finds.

age, diabetes, and heart issues place him at a heightened risk of developing serious complications should he be exposed to COVID-19 while in prison.").

      ***Third***, Mr. Rice has high blood pressure (hypertension), a condition that, over time, weakens the heart muscle, which can lead to heart attack or heart failure.[49]  *See* Ex. 10, Medical Records at 1.  As the CDC has warned, Covid-19 "can make it harder for your heart to work," noting that, in China, hypertension was associated with a case fatality rate more than six times that of patients without underlying medical conditions.[50]  Among 5,700 patients in New York City who were hospitalized with Covid-19, the most common underlying medical condition was hypertension (56.6 percent).[51]  *Cf. Rodriguez*, 2020 WL 1627331, at *8 (granting compassionate release because "it is the confluence of COVID-19 and [diabetes and hypertension] that makes this circumstance extraordinary and compelling"); *United States v. Sawicz*, 2020 WL 1815851, at *2 (E.D.N.Y Apr. 10, 2020) (granting compassionate release because Covid-19, combined with hypertension, constitutes an extraordinary and compelling reason).

      ***Fourth***, Mr. Rice has had chronic kidney disease (CKD) since 2013.  Ex. 10, Medical Records at 1, 3.  "[P]atients with chronic kidney disease. . . are at a high risk because

---

[49] *High Blood Pressure Dangers: Hypertension's Effects on Your Body*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/high-blood-pressure/art-20045868.

[50] *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, CDC (June 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[51] Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA, https://jamanetwork.com/journals/jama/fullarticle/2765184.

comorbidities increase the risk of dying from Covid-19."[52]  One finding is clear: early reports in China and New York found that 30 percent of patients hospitalized due to Covid-19 developed moderate to severe kidney injury—even in patients who previously did not have kidney problems.[53]  Moderate to severe kidney injury could be devastating for Mr. Rice, whose CKD has, in recent years, fluctuated between stage 2 and stage 3.  Ex. 10, Medical Records at 1, 3.

Any one of the above factors alone greatly increases Mr. Rice's risk of severe illness or death from Covid-19.  Multiplied together, these comorbidities combine and reinforce each other to render Covid-19 a uniquely dangerous threat to Mr. Rice's life.  The extreme infectiousness of Covid-19 in prisons and the higher mortality risk Mr. Rice is facing in light of his age and medical vulnerabilities make clear that extraordinary and compelling circumstances warrant a sentence reduction in this case.

"Releasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of COVID-19."  *United States v. Resnick*, No. 12-cr-152, 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020).

**C.  Every § 3553(a) factor strongly supports Mr. Rice's compassionate release.**

Section 3553(a) imposes an "overarching duty" on courts to "impose a sentence sufficient, but not greater than necessary," *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137

---

[52] *Are Kidneys Targeted by the Novel Coronavirus?*, Cath Lab Digest (Mar. 13, 2020), https://www.cathlabdigest.com/content/are-kidneys-targeted-novel-coronavirus.

[53] C. John Sperati, *Coronavirus: Kidney Damage Caused by COVID-19*, Johns Hopkins Med. (May 14, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-kidney-damage-caused-by-covid19.

S. Ct. 1170, 1175 (2017).  In ensuring that a sentence is not greater than necessary, the court must

consider the following factors: the applicable guideline; the seriousness of the offense; the need

for the sentence imposed to provide just punishment; the need to avoid sentencing disparities;

the need to protect the community; the defendant's post-sentence rehabilitation; the history and

characteristics of the defendant; and the need to provide the defendant with educational or

vocational training, medical care, or other correctional treatment in the most effective manner,

among others.  *See* § 3553(a)(1)-(7); *Pepper*, 562 U.S. at 481.  All of these factors strongly support

Mr. Rice's compassionate release request.

> ### i.   The applicable guideline, the seriousness of the offense, and the need for the sentence to provide just punishment support his compassionate release.

Mr. Rice is 72 years old and is approximately 16.5 years into a life sentence for being a

low-level, non-violent drug dealer.  He had a limited role in what was, apparently, a broader

enterprise well beyond his purview.  He did not use a weapon, and the PSR identified "no victim

who suffered a loss as a result of the defendant's conduct."  PSR ¶ 40.  Mr. Rice's life sentence

was never based on his role in the offense or the severity of the crime.  Rather, it was the result of

the mandatory life sentence imposed under 21 U.S.C. § 841(b)(1)(A).  But with the passage of the

First Step Act, his mandatory life sentence would no longer be statutorily required today—

instead, the guidelines would recommend 135 to 168 months (that is 11 years and 2 months to 14

years).  "That a defendant sentenced today, identical in every way to the defendant in this case,

would face [11 to 14 years] imprisonment is strong evidence that defendant's [16.5 years]

imprisonment adequately reflects the 'seriousness of his offense' and 'provides just punishment

for the offense.'"  *Curtis*, 2020 WL 1935543, at *5.

### ii.    The need to avoid unwarranted sentence disparities supports his compassionate release.

A reduction in Mr. Rice's sentence is not only necessary to "avoid unwarranted sentence disparities among defendants with similar records," but also to avoid sentence disparities among his very own co-defendants.  The following illustration documents the conspiracy's hierarchy, as well as the charges each co-defendant faced and the sentence they received:[54]



---

[54] *See* Ex. 7, Sentencing Chart (documenting each co-conspirator's relevant conduct, charges, conviction, and sentence with corresponding citations)

As illustrated above, those far more culpable than Mr. Rice and higher in the organization's chain of command received far lower sentences.  Paulino, for example, received 9 years and 2 months for leading the large-scale international drug trafficking operation and being personally responsible for smuggling more than 400 kilograms of cocaine and 10 kilograms of heroin into the United States, which were then spread all over the country.  *See* ECF No. 320 at 72.  Mr. Rice, by contrast, received life imprisonment for selling 1 kilogram of cocaine and 1 kilogram of heroin in Washington, D.C.  *See* PSR ¶ 39.  The rest of Mr. Rice's other co-defendants, with one exception,[55] "either had their charges dismissed or entered guilty pleas with sentences ranging from time served to a maximum of 10 years in prison."  *Rice*, 727 Fed. Appx. at 699.  That Mr. Rice's co-defendants received far lower sentences for similar or worse conduct shows that his continued incarceration only *creates* unwarranted sentencing disparities, and a reduction in his sentence is thus necessary to avoid them.

---

[55] Roland James Bailey represents the one exception, as he was originally sentenced to life imprisonment, but President Obama subsequently commuted Bailey's sentence to 30 years.  *See* ECF No. 989.  Treating Mr. Bailey and Mr. Rice the same, however, *creates* unwarranted sentence disparities, rather than avoids it, because the two are not similarly situated parties. Prior to this offense, Roland James Bailey was already nationally known as the defendant whose case went all the way to the Supreme Court in a challenge to the applicability of 18 U.S.C. § 924(c). *See United States v. Bailey*, 516 U.S. 137 (1995).  And at the time of Mr. Bailey's sentencing in this case, he was subject to the career offender guideline, which recommended a sentence of 360 months to life.  If Bailey were resentenced today, the result would be the same: Bailey would still have a recommended sentence of 360 months to life because he would still qualify as a career offender under U.S.S.G. § 4B1.1(B)—he has at least three qualifying convictions: (1) February 16, 1988—possession with intent to distribute cocaine; (2) May 22, 1988—possession with intent to distribute cocaine; and (3) September 26, 1988—possession with intent to distribute cocaine. *See* ECF No. 1028 at 13-14.  Mr. Rice, by contrast, has never qualified as a career offender.  And if resentenced today, Mr. Rice's guidelines would only recommend 135 to 168 months (11.25 to 14 years).

### iii.    The need to protect the community and Mr. Rice's significant post-sentence rehabilitation support his compassionate release.

Mr. Rice has demonstrated that he poses no danger to anyone and has only demonstrated significant post-sentence rehabilitation.  "Adopting a positive attitude in federal prison is hard." *Brown*, 2020 WL 2091802, at *1.  It is even harder for someone, like Mr. Rice, with a sentence of life without parole.  With that sentence, there is no incentive to behave.  There are no potential external rewards.  There is no hope.  Faced with the reality that he would die in prison, Mr. Rice could have followed the path of many of those before him: depression, drugs, and trouble.  He didn't.

That Mr. Rice has been a model inmate is an understatement.  Over the last 16.5 years, he has had only one minor disciplinary infraction from 2009 for giving/accepting money without authorization.  That is it.  He has actively mentored younger inmates "in getting their act together," and those who have been released have given back to their communities.  *See* Ex. 4, Rhozier Brown Letter at 1.  Furthermore, Mr. Rice earned his GED and has taken courses in starting a small business and critical thinking.  He has participated in weekly faith-based programs, Ex. 8, Progress Reports at 26-27, and has worked in various capacities, including as a CMS clerk and as an orderly, *id.* at 3.  And, despite having a life without parole sentence, the Bureau of Prisons has categorized him as having the lowest possible "recidivism risk level" — "minimum."  *Id.* at 2.

The Sentencing Commission's "research has demonstrated that reductions to sentence length and time served do not harm public safety."  *Transforming Prisons, Restoring Lives*, Charles

Colson Task Force on Federal Corrections, Urban Inst., at 21 (Jan. 2016).[56]  Mr. Rice's actions

over the last 16.5 years, when there were no potential external rewards, demonstrate that he not

only will be a productive member of society if released, but also show that he poses no risk to the

community.  *See Pepper v. United States*, 562 U.S. 476, 481 (2011) (discussing that a court may

consider evidence of a defendant's post-sentencing rehabilitation); *see also Rodriguez*, 2020 WL

1627331, at *10 (recognizing that rehabilitation, by itself, is not grounds for a sentencing

reduction under U.S.S.G. § 1B1.13 cmt. n.3 (citing U.S.C. § 994(t)), but finding it relevant in

conjunction with other factors when determining whether to grant compassionate release).

> iv.   **Mr. Rice's history and characteristics support his compassionate release.**

Mr. Rice has maintained strong family ties, even while incarcerated, who are willing

(begging) to assist him with his reentry into society.  He has been the main support system for his

identical twin brother, Arnold, who suffers from PTSD.  Ex. 2, Arnold Rice Letter at 2.  For his

younger siblings, Mr. Rice has been an indispensable father figure over the course of decades.

Ex. 3, Doris Hayden Letter at 1.  His wife, who suffers from severe PTSD, depended on him daily

before his imprisonment—Mr. Rice was like a lifeline to her.  *See* Ex. 1, Anthony Rice Letter at 6-

7.  Now, he remains a source of support for his wife through phone calls.  *Id.*  Even from behind

bars, Mr. Rice has been a source of support for his children and has tried to teach his children

good morals and values, including the pursuit of higher education.  *See* Ex. 5, SeBryna Coffey

Letter; Ex. 6, Tamika Coffey Letter.  Mr. Rice's deep commitment to his family shows in the

details: At the age of 68, he "taught himself in prison how to email" to stay in contact with

---

[56] Available at https://www.urban.org/research/publication/transforming-prisons-restoring-lives.

family, Ex. 5, SeBryna Coffey Letter, and he has never missed a birthday or special occasion, Ex. 6, Tamika Coffey Letter.  As the numerous heartfelt letters show, his family wants nothing more than his compassionate release.

Furthermore, the only violent incident in Mr. Rice's criminal history occurred more than 35 years ago.  In 1984, he was convicted for burglary, robbery with a dangerous weapon, use of a handgun in a crime of violence, theft, and burglary – accessory after the fact, all of which stemmed from the same incident.  PSR at 13-15.  During his original sentencing, Mr. Rice's criminal history was overstated as this one incident from 1984 accounted for all of his eight criminal history points.  *Id.*  Because of the remoteness of all of the prior convictions and the singular nature of the burglary, he should not have been considered to have a significant criminal history.

### v.   Principles of deterrence support his compassionate release.

Mr. Rice does not need to serve more time to deter this type of criminal conduct from occurring.  Studies have shown, time and again, that lengthy terms of incarceration do little to deter criminal conduct.  Specifically, research shows that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."  National Institute of Justice, U.S. DOJ Office of Justice Programs, *Five Things About Deterrence* (2016);[57] *see also id.* ("Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime.").

---

[57] Available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last visited June 15, 2020).

Moreover, Mr. Rice is, statistically speaking, unlikely to recidivate. His age group has the lowest recidivism rate—0 percent—compared to the general recidivism rate for all offenders, which hovers around 41 percent. *See* OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* iii, 40 (Feb. 2016).[58] Indeed, of a selected sample of inmates released between 2006 and 2010, none of the released inmates age 70 and older incurred a re-arrest for new crimes within three years. *See id.* at 39-40; *see also* U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017) (showing Mr. Rice's age places him in a class of prisoners least likely to recidivate).

Pairing the research with Mr. Rice's conduct over the last 16.5 years realistically forecloses the probability of recidivism. Mr. Rice needs no more prison time to deter him from criminal conduct, and his already significant sentence is sufficient to deter others. Keeping Mr. Rice in federal prison for the remaining years of his life is unnecessary because his incarceration thus far has already served the purposes of incapacitation, retribution, and general and specific deterrence.

### vi. The need to provide Mr. Rice with needed medical care in the most effective manner supports his compassionate release.

Mr. Rice is 72 years old, suffers from several chronic medical conditions, and is incarcerated at FCI Loretto. Even under normal circumstances, the BOP has struggled to meet the needs of aging inmates. BOP institutions have inadequate staffing capacity to provide timely medical care, accompany inmates on outside medical visits, assist with activities of daily living, and provide programming tailored to the elderly. *See* OIG, *The Impact of an Aging Inmate*

---

[58] Available at https://oig.justice.gov/reports/2015/e1505.pdf.

*Population on the Federal Bureau of Prisons* 17 (Feb. 2016)[59]; *see also* OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016) (noting that almost 20 percent of the BOP's health services positions are vacant, contributing to long waiting periods for care).[60]

"These are not normal times." *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020). Prisons by nature are fertile ground for the spread of Covid-19—overcrowded prisons even more so. And FCI Loretto is severely overcrowded.[61] It will thus only be a matter of time until the virus spreads through the prison, if it hasn't already. Mr. Rice should not be there when it does.

A firm release plan is in place for Mr. Rice. If released, he will return to his wife's home, where there will be ample room to self-quarantine. Their financial situation is secure, and his family is ready to support him in any way they can. *See* Ex. 1, Anthony Rice Letter at 9.

A grant of compassionate release from this Court would not only be an act of benevolence for Mr. Rice, but for his entire family. He respectfully requests this Court reduce his sentence to time served so he can spend his remaining years with his family.

---

[59] Available at https://oig.justice.gov/reports/2015/e1505.pdf.

[60] Available at https://oig.justice.gov/reports/2016/e1602.pdf.

[61] *Compare* Bureau of Prisons, *FCI Loretto*, https://www.bop.gov/locations/institutions/lor/ (last visited June 12, 2020) (noting that FCI Loretto has 896 total inmates—849 at the FCI and 47 at the Camp), *with* Bureau of Prisons, *Prison Rape Elimination Act (PREA) Audit Report*, 3 (Sept. 12, 2019) https://www.bop.gov/locations/institutions/lor/LOR_prea_2019.pdf (reporting that FCI Loretto has a facility capacity of 784 inmates).

## V. Conclusion

For the above reasons, Mr. Rice respectfully requests that this Court grant him compassionate release as set forth in the attached proposed Order, or such other relief as authorized by § 3582 and deemed appropriate by this Court.

Respectfully submitted,

A.J. KRAMER
Federal Public Defender

_____/s/_____
BENJAMIN FLICK
Research & Writing Attorney
Federal Public Defender's Office
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004
(202) 208-7500

## CERTIFICATE OF SERVICE

I certify that on June 24, 2020, a copy of Defendant's Emergency Motion for Compassionate Release was served via electronic mail upon:

Margaret J. Chriss
U.S. Attorney's Office
Special Proceedings Section
555 Fourth Street, NW
Washington, D.C. 20530
(202) 252-7555

_____/s/_____
BENJAMIN FLICK
Research & Writing Attorney
Federal Public Defender's Office
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004
(202) 208-7500